# United States Court of Appeals for the Federal Circuit

---

**RETURN MAIL, INC.,**
*Appellant*

v.

**UNITED STATES POSTAL SERVICE,
UNITED STATES,**
*Appellees*

---

2016-1502

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. CBM2014-00116.

---

Decided: August 28, 2017

---

RICHARD L. RAINEY, Covington & Burling LLP, Washington, DC, argued for appellant. Also represented by MICHAEL S. SAWYER; ERIC MICHAEL ADAMS, DOUGLAS H. ELLIOTT, The Elliott Law Firm, PLLC, Bellaire, TX; LEE LANDA KAPLAN, JEFFREY POTTS, Smyser, Kaplan & Veselka, LLP, Houston, TX.

DAVID ALLEN FOLEY, JR., Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellees. Also represented by BENJAMIN C. MIZER, JOHN FARGO.

---

Before PROST, *Chief Judge,* NEWMAN and WALLACH,
*Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

PROST, *Chief Judge*.

Patent assignee Return Mail, Inc. ("Return Mail") appeals from the final written decision of the U.S. Patent and Trademark Office's ("PTO") Patent Trial and Appeal Board ("Board") in a review of a covered business method ("CBM") patent. The Board held that the U.S. Postal Service and the United States (collectively, "the Postal Service") were not statutorily barred from filing the underlying petition for review. On the merits, the Board determined that all of the challenged patent claims were directed to ineligible subject matter under 35 U.S.C. § 101. We affirm.

## I. BACKGROUND

### A

In 2011, Congress enacted the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, which created several new quasi-adjudicatory proceedings before the PTO for determining the patentability of issued patent claims. These proceedings include inter partes review ("IPR"), post-grant review ("PGR"), and review of CBM patents ("CBM review"). *See* 35 U.S.C. §§ 311–319 (IPR); *id.* §§ 321–329 (PGR); AIA § 18, Pub. L. No. 112-29, 125 Stat. 284, 329–31 (2011) (CBM review).

This appeal arises from a CBM review, which unlike IPR or PGR, is limited to CBM patents—i.e., patents "that claim[] a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial

product or service," with the exception of "technological inventions." AIA § 18(d)(1). CBM review is also a "transitional" program, currently scheduled to sunset in September 2020. AIA § 18(a)(3). It is governed by AIA § 18 and, with certain exceptions, "employ[s] the standards and procedures of[] a [PGR] under [35 U.S.C. §§ 321– 329]." AIA § 18(a)(1).[1]

CBM review proceeds in two stages. In the first stage, the PTO Director makes a threshold determination of whether to institute the proceeding, which requires a determination that "it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable" or that "the petition raises a novel or unsettled legal question that is important to other patents or patent applications." 35 U.S.C. § 324(a), (b). This task has been delegated to the Board by regulation. 37 C.F.R. §§ 42.4(a), 42.300(a). If review is instituted, the parties then proceed to the second stage, which involves discovery, the submission of additional information, and the opportunity for an oral hearing. *See, e.g.*, 35 U.S.C. § 326(a)(3), (5), (8), (10), (12). Absent dismissal, the proceeding culminates with the Board's issuance of a "final written decision" regarding the patentability of "any patent claim challenged by the petitioner," as well as of "any new claim added" during the proceeding. *Id.* § 328(a). The Board must issue its final written decision within one year after the institution of CBM review, except in narrow circumstances. *Id.* § 326(a)(11). Ultimately, Congress intended CBM review, like the programs for IPR and PGR, "to provide [a] 'quick and cost effective alternative[]' to litigation in the courts." *PPC*

---

[1] AIA § 18 has not been codified in the U.S. Code and can be found at 125 Stat. at 329–31. For simplicity, we cite directly to portions of the U.S. Code that AIA § 18 employs.

*Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 741 (Fed. Cir. 2016) (quoting H.R. Rep. No. 112-98, pt. 1, at 48 (2011), *reprinted in* 2011 U.S.C.C.A.N. 67, 78).

B

Return Mail owns U.S. Patent No. 6,826,548 ("'548 patent"), which is the subject of the underlying CBM review as well as related litigation in the U.S. Court of Federal Claims ("Claims Court"). The '548 patent is directed to the processing of mail items that are undeliverable due to an inaccurate or obsolete address for the intended recipient. '548 patent col. 1 ll. 20–24. The patent underwent ex parte reexamination, resulting in the cancellation of all original claims and the issuance of new claims 39–63 in January 2011.[2] Ex Parte Reexamination Certificate 6,826,548 C1.

According to its specification, "[t]he processing of mail that is returned to sender historically has been a time-consuming labor-intensive process for high volume mail users." '548 patent col. 1 ll. 39–42. For instance, "[e]ven with the availability of address updating services to aid in researching for the correct address," the process of handling returned mail "[wa]s substantially a manual one subject to human error and delays." *Id.* at col. 1 ll. 39–51.

The claimed invention of the '548 patent purportedly "overcomes the historical problems with prior art manual handling" and "does so quickly, more accurately, and at substantially less cost." *Id.* at col. 1 ll. 55–59. It teaches encoding useful information, such as the name and address of intended recipients, on mail items in the form of a two-dimensional barcode. *Id.* at col. 2 ll. 4–5, col. 2 l. 66–col. 3 l. 15. Undeliverable mail items are returned to a

---

[2] References to the '548 patent throughout this opinion include the Ex Parte Reexamination Certificate.

processing location, where the barcodes are scanned. *Id.* at col. 2 ll. 14–20, col. 3 ll. 15–51. The scanned information is then processed, such as by obtaining corresponding updated address data from a computer or database, and the updated information is then electronically provided to the sender to be used as the sender deems appropriate. *Id.* at col. 2 ll. 19–27, col. 3 l. 52–col. 4 l. 33. In other words, the claimed invention allows returned mail to be processed "virtually entirely automatically through the exchange of data files between computers." *Id.* at col. 6 ll. 61–64.

## C

In February 2011, after trying unsuccessfully to license the '548 patent to the Postal Service, Return Mail filed suit in the Claims Court against the United States. It alleged under 28 U.S.C. § 1498(a) that the United States, through the Postal Service's actions, had "engage[d] in the unlicensed and unlawful use and infringement of the invention claimed in the '548 patent."[3] J.A. 3302. Return Mail sought relief in the form of "reasonable and entire compensation." J.A. 3297.

In April 2014, the Postal Service filed a petition with the PTO for CBM review of claims 39–44 (the "challenged claims") of the reexamined '548 patent. It raised several grounds for unpatentability, including patent-ineligible subject matter under § 101, anticipation under § 102, and

---

[3] If "an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same," the owner may obtain a remedy by filing an "action against the United States in the [Claims Court] . . . for the recovery of his reasonable and entire compensation for such use and manufacture." 28 U.S.C. § 1498(a).

obviousness under § 103.

In response, Return Mail not only raised patentability arguments but also contested the Postal Service's ability under the AIA to petition for CBM review. The Board held that the Postal Service had statutory "standing" and instituted review of all of the challenged claims under § 101 for ineligible subject matter.[4] In its final written decision, the Board later reiterated its standing determination and held that the challenged claims were drawn to ineligible subject matter under § 101.[5]

Return Mail timely appealed. Section 329 of the AIA authorizes a party dissatisfied with the Board's final written decision to appeal to this court under 35 U.S.C. § 141(c). We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## II. DISCUSSION

On appeal, Return Mail argues that we should vacate the Board's decision because the Postal Service failed to meet the statutory standing requirement to petition for CBM review. It also argues in the alternative that we should reverse the Board's decision that the '548 patent claims 42–44 are directed to § 101 ineligible subject

---

[4] As explained below, the concept of judicial standing is distinct from that of whether a party is properly before an agency. We will refer to AIA § 18(a)(1)(B) as a "standing" provision in the sense that it sets forth a statutory prerequisite for a party to petition the PTO for CBM review.

[5] The Board also instituted CBM review under § 102 but held in the final written decision that the challenged claims were not anticipated. Anticipation is not at issue in this appeal.

matter.[6] Return Mail does not challenge any other aspects of the CBM review proceeding.

## A

The "starting point" for determining whether a party is properly before an agency is "the statute that confers standing before that agency." *Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir. 1999). Because the PTO is an administrative agency, the Article III standing requirement for a "case or controversy" does not apply to matters before it. *Id.* at 1094; *see also Koniag, Inc. v. Andrus*, 580 F.2d 601, 612 (D.C. Cir. 1978) ("Congress, in its discretion, can require that any person be admitted to administrative proceedings, whether or not that person . . . has satisfied the . . . constitutional standing requirements recognized by the Supreme Court."). Relevant to CBM review, AIA § 18(a)(1)(B) provides that "[a] person may not file a petition for [CBM review] unless the person or the person's real party in interest or privy has been *sued for infringement* of the patent or has been *charged with infringement* under that patent." (Emphases added).

Here, the Board in its institution decision held that the Postal Service had standing because it had been sued for infringement within the meaning of AIA § 18. The Board reasoned that Return Mail filed its § 1498(a) action to hold the Postal Service "liable for its use or manufacture of a patented invention without license or lawful right, which falls within the definition of patent infringement." J.A. 50. It further held that the PTO, through regulation regarding the meaning of "charged with infringement," has made it "clear that it is the ability to

---

6 Return Mail does "not directly appeal[]" the Board's determination that claims 39–41 of the '548 patent are also directed to § 101 patent-ineligible subject matter. Appellant's Opening Br. 48 n.3.

seek relief in *Federal court* that is important to the standing inquiry."[7]  J.A. 51.

After the Board instituted the underlying proceeding, Return Mail continued to submit that the Postal Service lacked standing to seek CBM review.  The Board again rejected that contention and "incorporate[d]" its previous standing analysis into the final written decision.  J.A. 12.

1

As a threshold matter, we first consider whether we have authority to review the Board's determination that the Postal Service had standing to petition for CBM review, a question that we have never previously answered.  The AIA authorizes appeals from the Board's final written decision in a CBM review proceeding.  35 U.S.C. § 329.  But the statute also includes a "No Appeal" provision, 35 U.S.C. § 324(e), stating that *[t]he determination by the Director whether to institute . . .* review under this section" is "final and nonappealable."  (Emphasis added).  The Postal Service argues that § 324(e) bars this court from revisiting whether "the Board erred in instituting the proceeding in the first place," based in part on the determination that the Postal Service had § 18(a)(1)(B) standing.  Appellees' Br. 17.

As the Supreme Court recently reiterated, there is a "'strong presumption' in favor of judicial review" when interpreting "statutes that may limit or preclude review." *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2140 (2016) (quoting *Mach Mining, LLC v. EEOC*, 135 S. Ct.

---

[7]    The relevant regulation provides that "[c]harged with infringement means a real and substantial controversy regarding infringement of a [CBM] patent exists such that the petitioner would have standing to bring a declaratory judgment action in Federal court."  37 C.F.R. § 42.302(a).

1645, 1650–51 (2015)). As the party "seeking to overcome this strong presumption," the Postal Service "faces a 'heavy burden'"—it must demonstrate a contrary legislative intent "by 'clear and convincing' evidence." *Versata Dev. Grp. v. SAP Am., Inc.*, 793 F.3d 1306, 1320 (Fed. Cir. 2015) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 671–72 (1986)). To the extent any "doubt about congressional intent exists, the general presumption favoring judicial review of rights-changing administrative action is controlling." *Id.*

Even though the Board initially determined in its institution decision that the Postal Service had standing, that fact alone does not preclude judicial review. The AIA draws a "clear and common-sense distinction" between a final written decision by the Board and an earlier decision whether to institute CBM review. *GTNX, Inc. v. INTTRA, Inc.*, 789 F.3d 1309, 1312 (Fed. Cir. 2015). But not all issues fall neatly into that dichotomy. Some issues are not necessarily confined to one stage of CBM review or the other, and the Board may later decide, as it did here, to revisit a determination previously made at the institution phase. We have held that the availability of judicial review does not hinge on such "timing" or "[o]verlap" of issues. *Versata*, 793 F.3d at 1319. Thus, even if § 18(a)(1)(B) standing is best addressed at the institution stage so as to avoid unnecessary proceedings, that the Board first decided it at the institution stage in this case is not enough, by itself, to bar judicial review.

The Postal Service submits that the Supreme Court's decision in *Cuozzo* and this court's decision in *Achates Reference Publishing, Inc. v. Apple Inc.*, 803 F.3d 652 (Fed. Cir. 2015),[8] confirm that the Board's determination

---

[8] The en banc court is currently considering the continued viability of *Achates* in *Wi-Fi One, LLC v. Broadcom Corp.*, 2015-1944, -1945, -1946.

that the Postal Service had standing to petition for CBM review is not reviewable. Both cases interpreted the scope of 35 U.S.C. § 314(d), an analogous no-appeal provision for the IPR program. Because the pertinent language of § 314(d) is identical to that of § 324(e), case law interpreting the scope of § 314(d) bears on the scope of § 324(e). *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ("[C]onsiderations of stare decisis strongly support our adherence to [precedent] and the long line of related cases where we interpret [related statutory provisions] similarly."). Nevertheless, we conclude that *Cuozzo* and *Achates* are distinguishable and do not dictate the availability of judicial review in this case.

In *Cuozzo*, the Supreme Court interpreted § 314(d) to bar judicial review of determinations under 35 U.S.C. § 314(a) regarding the "reasonable likelihood" of success of an IPR petition, as well as challenges grounded "in a statute closely related to that decision to institute [IPR]." 136 S. Ct. at 2142 (internal quotation marks omitted). The Court held that the dispute at issue—whether the petitioner met a statutory requirement to set forth grounds for an IPR petition with particularity—was barred by § 314(d) from judicial review because it merely amounted to an "ordinary dispute" about the PTO's decision to institute and was grounded in "a statute closely related to th[e] decision to institute." *Id.* at 2139, 2142. Here, in contrast, whether a party is statutorily allowed to petition for CBM review does not amount to "little more than a challenge to the [PTO's] conclusion" about the petition's likelihood of success on the merits.[9] *Id.* at 2142.

---

[9]    As noted above, a CBM petition must show that, if unrebutted, it is "more likely than not" that the petitioner would prevail. 35 U.S.C. § 324(a). That the threshold for instituting an IPR is, instead, "reasonable likelihood" of

Nor is it a "minor statutory technicality" that can be cured by a more precise or fulsome filing. *Id.* at 2140. The Board's determination of whether a party is qualified under § 18(a)(1)(B) to petition for CBM review is a condition precedent independent from a threshold analysis regarding the likelihood of success of the information contained in the petition. *See City of Arlington v. FCC,* 133 S. Ct. 1863, 1869 (2013) (explaining that federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, . . . what they do is ultra vires").

The Postal Service's reliance on *Achates* is also unavailing. There, we held that the PTO's determination that a petitioner has satisfied 35 U.S.C. § 315(b)'s statutory time bar to petition for IPR is unreviewable because that requirement "does not impact the Board's authority to invalidate a patent claim—it only bars particular petitioners from challenging the claim." *Achates*, 803 F.3d at 657. The Postal Service argues that § 18(a)(1)(B) similarly affects only *who* can file a petition—i.e., as long as a proper petitioner requests CBM review of a patent, the Board's authority to cancel that patent is unaffected. We disagree.

*Achates* is distinguishable based on differences in the statutory framework for IPR and CBM review. First, for IPR proceedings, any "person who is not the owner of [the challenged] patent" can petition for review of a patent. 35 U.S.C. § 311(a). Put another way, "[p]arties that initiate the [IPR] proceeding need not have a concrete stake in the outcome." *Cuozzo*, 136 S. Ct. at 2143. In contrast, by requiring a petitioner for CBM review to have been sued for or charged with infringement of the underlying patent, § 18(a)(1)(B) ensures that CBM review is limited to par-

---

success under 35 U.S.C. § 314(a) is immaterial for purposes of this case.

ties who have some stake in the outcome. If a party is barred by § 18(a)(1)(B) from petitioning for CBM review of a patent, it cannot be assumed that the same patent could be challenged by an unrelated third party.[10] To treat these distinct grants of authority as coterminous would require us to ignore the plain terms of the respective statutes. We may not do so. *See Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it another." (citation omitted)); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Second, the IPR time bar,

---

[10] For example, Return Mail represents that it has only ever asserted the '548 patent against the Postal Service, such that no other party has an arguable basis under § 18(a)(1)(B) to challenge the patent through CBM revew.

Although the PTAB may issue a final written decision in a CBM review if no petitioner remains, this does not mean that we do not have the authority to review the government's standing to file the petition. It is true that the PTAB "may terminate the [CBM] review or proceed to a final written decision" if "no petitioner remains in the post-grant review." 35 U.S.C. § 327(a). However, that does not mean that the PTAB may proceed to a final written decision if the party filing the petition lacked standing to do so, for it would render meaningless the conditions precedent for PTO action in § 18(a)(1) and license the PTO to act *ultra vires*. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (holding that courts should avoid constructions that would render statutory text "superfluous"); *see also City of Arlington*, 133 S. Ct. at 1869 (explaining that federal agencies may act only pursuant to the authority conferred by Congress).

"like other '[f]iling deadlines,' . . . is merely a 'rule[] that seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'" *Achates*, 803 F.3d at 658 (alterations in original) (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011)). Unlike the IPR time bar which is simply a procedural requirement that rights be exercised in a timely manner, § 18(a)(1)(B) relates to a party's right to seek CBM review in the first instance.

There is no doubt that, despite the AIA's no-appeal provisions, judicial review remains available on questions of "whether the [Board] exceeded statutory limits on its authority to invalidate." *Versata*, 793 F.3d at 1319; *see also Cuozzo*, 136 S. Ct. at 2141 (holding that § 314(d) does not preclude judicial review when the PTO "act[s] outside its statutory limits"). As we have explained, to hold otherwise would "run counter" to both the language of the no-appeal provisions (restricted to determinations of whether to institute) and "our long tradition of judicial review of government actions that alter the legal rights of an affected person." *Versata*, 793 F.3d at 1319. For example, in *Versata* we held that this court could review the Board's determination of whether a patent is a CBM patent under AIA § 18(a)(1)(E) because that statutory provision limits the Board's authority to invalidate a patent. *Id.* at 1320. The § 18(a)(1)(B) standing requirement at issue here appears in the same subsection and similarly limits the Board's authority to invalidate a patent through CBM review. Even though it is not phrased in terms of what the Director can or cannot do, Congress placed an express limitation on the reach of the CBM review program, a "special review regime" that is only available for an eight-year transitional period. *Id.* Where determinations are "fundamental or 'jurisdictional,' in the sense that their existence is a condition precedent to the operation of the statutory scheme[,] [such] fundamental requirements are . . . indispensable to the

application of the statute . . . because the Congress has so provided explicitly." *Crowell v. Benson*, 285 U.S. 22, 54–55 (1932) (footnote omitted).

The legislative history of the AIA supports our conclusion that questions related to a party's standing touch upon the PTO's ultimate authority to act.  Congress explained that the PTO's ability to conduct CBM review "is limited in certain respects" and highlighted that the PTO "cannot" grant a petition "unless the petitioner or his real party in interest has been sued for infringement of the patent or has been charged with infringement."  H.R. Rep. No. 112-98, at 80 (2011), *reprinted in* 2011 U.S.C.C.A.N. 67, 105.  That Congress did not intend the PTO to act absent a petition filed by a party with the requisite standing confirms that § 18(a)(1)(B) provides a fundamental limitation on the PTO's authority.

For the foregoing reasons, we hold that § 324(e) does not bar judicial review of the Board's decision that a party satisfies § 18(a)(1)(B)'s requirements to petition for CBM review.

2

We turn now to the Board's determination that the Postal Service had standing to petition for CBM review because it had been "sued for infringement" of the '548 patent within the meaning of § 18(a)(1)(B).

At the outset, the parties disagree on the applicable standard of review.  The Postal Service argues that the Board's determination is subject to arbitrary-and-capricious review under the Administrative Procedure Act ("APA"), while Return Mail contends that de novo review applies.  It is true that we review PTO decisions under the standards set forth in the APA, but those standards allow us to also set aside agency actions that are "not in accordance with law."  5 U.S.C. § 706(2); *see Pride Mobility Prods. Corp. v. Permobil, Inc.*, 818 F.3d 1307, 1313 (Fed.

Cir. 2016) (reciting APA standards). Accordingly, where, as here, the parties' arguments raise a purely legal question of statutory interpretation, we apply de novo review.[11] *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 889 (Fed. Cir. 2017); *Secure Axcess, LLC v. PNC Bank Nat'l Ass'n*, 848 F.3d 1370, 1377 (2017).

Return Mail makes several cogent arguments why a § 1498(a) suit, in some sense, is not one for "infringement." But while we recognize there are important differences between § 1498(a) suits against the government and suits for infringement against private parties, these differences, along with Return Mail's other arguments, are insufficient to compel a conclusion that Congress intended to exclude a government-related party sued under § 1498(a) from being able to petition for CBM review.

---

[11] The Postal Service submits that the Board's interpretation of "sued for infringement" "comports with previous guidance provided in rulemaking from the PTO." Appellees' Br. 27–28 (citing 77 Fed. Reg. 48,734, 48,742; 77 Fed. Reg. 48,680, 47,726). But there is no assertion that we should defer to those PTO remarks under *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or *Auer v. Robbins*, 519 U.S. 452 (1997). Indeed, the PTO's rulemaking on § 18(a)(1)(B) repeats the statute's "sued for infringement" language without interpreting it. *See* 37 C.F.R. § 42.302(a) (stating that a petitioner for CBM review must have been "sued for infringement or . . . charged with infringement" and then defining only "charged with infringement"). We do not give deference to an agency regulation that merely "parrot[s]" statutory language. *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

a

Before discussing whether being sued under § 1498(a) constitutes being "sued for infringement" under § 18(a)(1)(B), we provide an overview of the nature of a § 1498(a) suit.

Prior to the enactment of § 1498(a), the Supreme Court held that the government had not waived sovereign immunity for patent infringement actions sounding in tort. *Schillinger v. United States*, 155 U.S. 163, 170 (1894); *see also United States v. Berdan Fire-Arms Mfg. Co.*, 156 U.S. 552, 565–66 (1895) ("Even if there were findings sufficient to show that the government had in any manner infringed upon this patent, . . . a mere infringement, which is only a tort, creates no cause of action cognizable in the court of claims."). In other words, absent a contractual relationship with the government, "a patent holder lacked a remedy for infringement by the United States." *Zoltek Corp. v. United States*, 672 F.3d 1309, 1315 (Fed. Cir. 2012) (en banc in relevant part). Congress responded in 1910 by enacting the precursor to § 1498(a), under which the government assumes liability for the "use or manufacture" of a claimed invention "by or for the United States without license of the owner thereof or lawful right to use or manufacture the same." 28 U.S.C. § 1498(a).

Section 1498(a) "is an eminent domain statute," wherein the government "has consented thereunder only to be sued for its taking of a patent license." *Decca Ltd. v. United States*, 640 F.2d 1156, 1167 (Ct. Cl. 1980); *see also Leesona Corp. v. United States*, 599 F.2d 958, 964 (Ct. Cl. 1979) (discussing § 1498's basis in eminent domain); *Tektronix, Inc. v. United States*, 552 F.2d 343, 346 (Ct. Cl. 1977) ("It is settled that recovery of reasonable compensation under § 1498 is premised on a theory of an eminent domain taking under the Fifth Amendment."). The government therefore remains immune from suit under the

Patent Act, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent."  35 U.S.C. § 281.

Return Mail submits that because § 1498(a) is grounded in eminent domain, it cannot be a suit for "infringement."  We disagree.  It is true that this provision "creates its own independent cause of action," which is "'only parallel and not identical'" to an infringement action under the Patent Act.  *Zoltek*, 672 F.3d at 1321 (quoting *Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984)).  We have held that certain relief otherwise available to a patentee under the Patent Act is unavailable in § 1498(a) actions, such as § 283 injunctive relief, § 284 treble damages, § 285 exceptional case attorney fees, and § 287 damages limitations based on a failure to mark.  *Motorola*, 729 F.2d at 768 n.3, 772.  None of those distinctions, however, relates to the underlying basis of liability in a § 1498(a) suit.

Return Mail selectively quotes from *Motorola*, relying on our statement that the government "is *not a putative infringer* but is deemed a licensee."  *Motorola*, 729 F.2d at 772 (emphasis added).  But *Motorola* says that the government is "not in the position of an *ordinary* infringer," not that the government cannot infringe.  729 F.2d at 768 (emphasis added).  In fact, *Motorola* has language tying § 1498(a) to infringement, stating that "the Government can only be *sued for any direct infringement* of a patent."  *Id.* at 768 n.3 (emphasis added).  And, to be sure, we and our predecessor court have often described § 1498(a) suits as alleging "infringement."  *See, e.g.*, *Zoltek*, 672 F.3d at 1327 ("[Section] 1498(a) creates a[] . . . cause of action for direct infringement by the Government or its contractors. . . . [U]nder § 1498(a) the Government has waived its sovereign immunity for direct infringement[] . . . ."); *Decca*, 640 F.2d at 1167 (characterizing § 1498(a) as a waiver of sovereign immunity "with respect to a direct governmental infringement of a patent" (footnote omit-

ted)).

Return Mail separately points out that the word "infringement" is absent from the text of § 1498(a), whereas neighboring provisions in 28 U.S.C. §§ 1498(b) and 1498(d) expressly refer to, respectively, copyright "infringement" and "infringement" of certificate of plant variety protection. *See* Plant Variety Protection Act, Pub. L. 91-577, 84 Stat. 1542, 1559 (1970) (adding 28 U.S.C. § 1498(d)); Act of September 8, 1960, Pub. L. 86-726, 74 Stat. 855, 856 (adding § 1498(b)); Act of June 25, 1910, Pub. L. No. 61-305, 36 Stat. 851 (enacting precursor to § 1498(a)). We are not persuaded that the absence of the word "infringement" from § 1498(a), which was enacted before both §§ 1498(b) and 1498(d), carries dispositive weight. Indeed, that Congress subsequently characterized governmental encroachment on other rights as "infringement" may actually support a reading that Congress also understood infringement to be the basis for governmental liability in the patent context. The legislative history of § 1498(a) can be credibly interpreted to support this understanding. *See, e.g.*, H.R. Rep. No. 61-1288, at 1 (1910) (noting that the precursor to § 1498(a) was intended "to enlarge the jurisdiction of the Court of Claims so that said court may entertain suits against the United States *for the infringement or unauthorized use* of a patented invention, in certain cases, and award reasonable compensation to the owner of the patent" (emphasis added)); H.R. Rep. No. 82-1726, at 3 (1952) (referring to § 1498(a) suits as "suit[s] for patent infringement" when amending the statute).

Return Mail appears to argue that the government cannot infringe because infringement requires action without authority, and the government has an implied license to practice patented inventions. Appellant's Opening Br. 43 (arguing that the government "has 'undoubted authority . . . to exert the power of eminent domain' over a patented invention"). But the text of

§ 1498(a) provides that liability attaches when the government acts "without license . . . or lawful right."  In other words, when the government uses or manufactures a patented invention, it is not presumed to have a pre-existing license or lawful right to do so.  *Cf. Leesona*, 599 F.2d at 965 ("When the government has infringed, it is deemed to have 'taken' [a] patent license under an eminent domain theory.").

b

We turn next to the scope of the term "sued for infringement" in § 18(a)(1)(B).  Again, this subsection provides that a person may not file a petition for CBM review of a patent unless the person, or the person's real party in interest or privy, has been "sued for infringement of the patent" or "charged with infringement under that patent."  Section 18 does not define the term "infringement."[12]

The Postal Service argues that in normal usage the word "infringement" "is used to describe a claim under a

---

[12]  Neither party discusses the significance, if any, of the term "person" in § 18(a)(1)(B).  We note that "[i]n common usage th[e] term ['persons'] does not include the sovereign, and statutes employing it will ordinarily not be construed to do so." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 275 (1947).  At the same, however, there is "no hard and fast rule of exclusion, and much depends on the context, the subject matter, legislative history, and executive interpretation." *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979).  Return Mail has waived reliance on the term "person" because it failed to make any arguments in that regard in its opening brief. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

§ 1498 action." Appellees' Br. 29. Return Mail appears to acknowledge that the ordinary meaning of "infringement" is broad. *See* Appellant's Opening Br. 44 ("[T]he term 'infringement' is often shorthand for whether the accused activity meets all the limitations of a patent claim.").[13] But Return Mail argues that Congress used the term "infringement" more narrowly to refer to infringement under the Patent Act, Title 35 of the U.S. Code. Under 35 U.S.C. § 271(a), direct infringement occurs when someone "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention." Because the government is immune from suit under the Patent Act, Return Mail contends that the government cannot be sued for "infringement" as defined in that statute.

Applying fundamental canons of statutory construction, we agree with the Postal Service that being sued under § 1498(a) is broad enough to encompass being sued for "infringement" as that term is used in § 18(a)(1)(B).

It is well-established that when a statute does not define a term, "words will be interpreted as taking their ordinary, contemporary, common meaning" at the time that Congress enacted the statute. *Perrin v. United States*, 444 U.S. 37, 42 (1979). Courts may look to dictionaries in use when Congress enacted a statute to inform the ordinary meaning of a term. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002–04 (2012) (surveying relevant dictionaries to interpret a statute). Common usage of the term "infringement" in the patent law context refers to "[a]n act that interferes with one of the exclusive rights of a patent[] . . . owner." *Infringement*, Black's Law Dictionary (9th ed. 2009). Those rights

---

[13]  Return Mail's § 1498(a) complaint accused the Postal Service of "infringing" the '548 patent in multiple instances. *See, e.g.*, J.A. 3297 ¶ 1, J.A. 3302 ¶ 21.

include "the right to exclude others from making, using, offering for sale, or selling [the claimed] invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154(a)(1); *see also Impression Prods., Inc. v. Lexmark Int'l., Inc.*, 137 S. Ct. 1523, 1534 (2017) ("What a patent adds—and grants exclusively to the patentee—is a limited right to prevent others from [using, selling, or importing an item].""). Accordingly, patent infringement encompasses "[t]he unauthorized making, using, offering to sell, selling, or importing into the United States of any patented invention," which, not surprisingly, closely tracks the language of the Patent Act. *Patent Infringement*, Black's Law Dictionary (9th ed. 2009) (citing 35 U.S.C. § 271(a)).

But nothing in the text of § 18(a)(1)(B) indicates an intent to restrict "infringement" to suits that fall under the Patent Act. Congress is presumed to be "aware of existing law when it passes legislation." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 742 (2014). When Congress enacted the AIA in 2011, the law did not preclude § 1498(a) suits from being suits for infringement. Congress could have easily specified the phrase "sued for infringement" to require being sued for infringement under 35 U.S.C. § 271 or otherwise excluded § 1498 suits from the definition of "sued for infringement," but it did not do so.[14] We may not rewrite the statute on

---

[14] Return Mail notes that in *Suprema, Inc. v. International Trade Commission*, 796 F.3d 1338 (Fed. Cir. 2015) (en banc), we referred to § 271 as "the statutory provision defining patent infringement." *Id.* at 1346. We made that comment in the context of 19 U.S.C. § 1337, which makes it unlawful to import infringing articles and, like the Patent Act, does not apply to the government. *See* 19 U.S.C. § 1337(l). Our statement in *Suprema* was not a global conclusion that only § 271 suits allege in-

Congress's behalf. *See United States v. Fausto*, 484 U.S. 439, 453 (1988) ("[I]t can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change."). And adopting Return Mail's preferred construction of § 18(a)(1)(B) as limited to infringement under § 271 would impose additional conditions not present in the statute's text. *See Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1111 (Fed. Cir. 2004) (holding that courts must avoid "add[ing] conditions" to the applicability of a statute that do not appear in the provision's text). Precedent counsels against us doing so. Under the ordinary meaning of "infringement," a § 1498(a) suit is squarely one for government infringement of a patent. When a patent owner brings a § 1498(a) suit, it alleges that the government has unlawfully interfered with its rights by manufacturing or using the patented invention. Those activities "come[] within the scope of the right to exclude granted in 35 U.S.C. § 154(a)(1)." *Zoltek*, 672 F.3d at 1327. Indeed, in *Zoltek*, we "defined 'without lawful right' for purposes of § 1498(a)" to overlap with direct infringement—i.e., "use of an invention that, if done by a private party, would directly infringe the patent." *Id.* at 1323. Liability under this provision, like liability under § 271(a), requires a showing that "each limitation is present in the accused product or process," such that the government "*would be liable for direct infringement* of the patent right for such use or manufacture if [it] was a private party." *Id.* at 1319 (emphasis added). Accordingly, § 1498 encompasses "any direct infringement that would normally require a license by a private party." *Id.* at 1320. Infringement is a prerequisite to § 1498(a) liability; the government's infringement triggers its obligation to pay just compensation. *See James v. Campbell*, 104 U.S. 356, 357–58 (1881)

---

fringement, and it was not related to construing the statute at issue here.

(holding that a patent "confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation"); *see also Crozier v. Fried Krupp Aktiengesellschaft*, 224 U.S. 290, 303 (1912) (interpreting an earlier iteration of § 1498 and explaining that "[t]he text of this statute leaves no room to doubt that it was adopted in contemplation of the contingency of the assertion by a patentee that rights secured to him by a patent had been invaded for the benefit of the United States by one of its officers; *that is, that such officer, under the conditions stated, had infringed a patent.*" (emphasis added)).

We acknowledge Return Mail's argument that allowing the government, when sued under § 1498(a), to petition for CBM review may create tension with the estoppel provision for CBM review. AIA § 18(a)(1)(D) provides:

> The petitioner in a transitional proceeding that results in a final written decision under [35 U.S.C. § 328(a)] with respect to a claim in a [CBM] patent, or the petitioner's real party in interest, may not assert, *either in a civil action arising in whole or in part under [28 U.S.C. § 1338], or in a proceeding before the International Trade Commission under [19 U.S.C. § 1337]*, that the claim is invalid on any ground that the petitioner raised during that transitional proceeding.

(Emphasis added). This estoppel provision applies to petitioners litigating in district court or the ITC, but it is silent as to petitioners litigating in the Claims Court.

Return Mail argues that the legislative history demonstrates that Congress intended estoppel to be the cornerstone of the post-grant review process, as it "recognize[d] the importance of quiet title to patent owners to ensure continued investment resources." Appellant's Reply Br. 24–25 (alteration in original) (quoting H.R. Rep.

No. 112-98, pt. 1, at 48 (2011)).    Yet construing § 18(a)(1)(B) to allow the government to petition for CBM review, as we do today, means that the government would enjoy the unique advantage of not being estopped in the Claims Court from re-litigating grounds raised during a CBM review proceeding.

The Postal Service does not dispute the oddity of this result and acknowledges that the government would not be subject to estoppel under this construction.  Appellees' Br. 32 & n.9.  Although this raises certain policy concerns, Congress is better suited to address them by revising the estoppel provisions for CBM review should it see fit. Thus, we leave the soundness of exempting the government from the estoppel provision to Congress, as precedent demands.  *See Blount v. Rizzi*, 400 U.S. 410, 419 (1971) ("[I]it is for Congress, not this Court, to rewrite the statute."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 434 (1990) ("[T]his Court has never upheld an assertion of estoppel against the Government by a claimant seeking public funds.").

The dissent does not disagree with our interpretation of "sued for infringement" but, instead, believes that the word "person" dictates a different result.  We respectfully disagree.  First, neither Return Mail nor the Postal Service discusses the significance, if any, of the word "person" as used in § 18(a)(1)(B).  This issue is distinct and independent from the dispute before us regarding the meaning of the phrase "sued for infringement."  Return Mail's failure to develop any arguments on this issue would typically constitute waiver.  *See SmithKline Beecham*, 439 F.3d at 1319 ("Our law is well established that arguments not raised in the opening brief are waived."); *see also Nat. Res. Def. Council, Inc. v. EPA*, 25 F.3d 1063, 1074 (D.C. Cir. 1994) ("[F]ailure to raise a particular question of statutory construction before an agency constitutes waiv-

er of the argument in court.").[15]

Second, even assuming the issue is not waivable or is important enough to address without the benefit of the parties' briefing, we are not persuaded that the word "person" upends the applicability of § 18(a)(1)(B) to the government. The dissent relies on a presumption that "[i]n common usage th[e] term ['persons'] does not include the sovereign, and statutes employing it will ordinarily not be construed to do so." *United Mine Workers of Am.*, 330 U.S. at 275. But when determining the scope of the term "person," there is "no hard and fast rule of exclusion, and much depends on the context, the subject matter, legislative history, and executive interpretation." *Wilson*, 442 U.S. at 667. And any presumption that the term "person" excludes the government carries less weight here because the statute "confer[s] a benefit or advantage" to the government, rather than "a burden or limitation." *Id.*; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) (stating that the exclusion of sovereigns from "person" "is particularly applicable where it is claimed

---

[15] The dissent characterizes these statements as the majority having "h[e]ld" that this issue was waived. Dissenting Op. 1–2. Not so. We observe that the failure to brief an issue ordinarily constitutes waiver under our precedent. The dissent, in contrast, declares—unequivocally—that the issue cannot be waived. *Id.* at 3. Yet the cases it relies on in support do not sustain its conclusion, but rather merely address waiver in the Article III context or implicate our case-by-case discretion to entertain a waived issue in spite of our well established precedent to the contrary. Although we express our doubts regarding the dissent's analysis and conclusions on waiver, we respond to its concerns in the paragraphs that follow working from its own assumption that the issue cannot be waived.

that Congress has subjected the States to liability to which they had not been subject before").

Contrary to the dissent's allegation that we improperly construe this provision "in isolation" from the context of the whole Act, Dissenting Op. 8–9 n.1, we apply the "premise that [a] term should be construed, if possible, to give it a consistent meaning throughout [an] Act." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995). The AIA does not appear to use the term "person" to exclude the government in other provisions. For example, its provisions on intervening rights provide that "[a]ny proposed amended or new claim determined to be patentable and incorporated into a patent" after an IPR, PGR, or CBM review has "the same effect as that specified in [35 U.S.C. § 252] for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim." 35 U.S.C. §§ 318(c), 328(c); *see also, e.g., id.* § 311(a) (making IPR available to any "person who is not the owner of [the challenged] patent").

The dissent, on the other hand, places great emphasis on the "statutory balance" Congress created through the AIA's estoppel provisions to support its interpretation of this statute. Dissenting Op. 7–9. Yet it relies on these estoppel provisions—a policy consideration—to inform the construction of a word for which it, itself, concedes the legislative history does not directly address.[16] *Id.* at 4. In

---

[16] Specifically, the dissent argues that it is reasonable to assume that Congress did not intend to include the United States because it would have complicated enactment of the AIA. Dissenting Op. 4. Yet it concedes that the legislative record does not explore what the dissent characterizes as these "potential complexities," nor does it even attempt to define what they entail. *Id.*

doing so, and in the absence of briefing, the dissent engages in mere speculation that Congress intended to exclude the government from filing petitions despite the lack of a record or any indication that it intended this result. Indeed, it is not our role to speculate on these policy concerns in the absence of Congressional guidance and rely on them to justify rewriting the plain language of a statute. To do so would be the classic example of letting the tail wag the dog.[17] For the reasons set forth above, we believe the better reading of "person" in § 18(a)(1)(B) does not exclude the government.

The creation of the CBM review framework stemmed from a "general concern, including within the halls of Congress, regarding litigation abuse over business method patents." *Versata*, 793 F.3d at 1325. Congress therefore created CBM review as a "special review regime, over and above any other authority the [Board] might have," for quickly reviewing such patents viewed to be especially prone to litigation abuse. *Id.* at 1320. This regime was so unusual that Congress placed an eight-year time limit on it. *Id.* It is not surprising, then, that § 18(a)(1)(B) ensures that the CBM patent being challenged is the subject of an existing infringement controversy. There does not appear to be any reason, and Return Mail has provided none, to curtail the ability of the government to initiate a CBM proceeding when, like a party sued in federal dis-

---

[17] To further support its estoppel argument, the dissent observes that the CBM statute makes no mention of infringement litigation in the Claims Court—the principal reason why the government can circumvent these estoppel provisions under our interpretation. Dissenting Op. 7. But again, the solution to the dissent's concern is for Congress to "correct" this imbalance should it see fit, rather than allow this potential inequity to drive our interpretation of the plain language of the statute.

trict court or the ITC, it has interests at stake with respect to the patent it has been accused of infringing.[18]

We therefore conclude that the Postal Service was "sued for infringement" within the meaning of § 18(a)(1)(B) when Return Mail filed the Claims Court suit against it under § 1498(a). Because § 18(a)(1)(B)'s requirements to be either "sued for infringement" or "charged with infringement" are disjunctive, we do not reach whether the Postal Service was also "charged with infringement."

B

Next, we address whether the Board erred in holding that claims 42–44 of the '548 patent are directed to § 101 patent-eligible subject matter. We apply de novo review to "questions concerning compliance with the doctrinal requirements of § 101." *Versata*, 793 F.3d at 1331.

Return Mail emphasizes that the claims at issue on appeal for purposes of § 101—claims 42–44 of the '548 patent—recite encoding a particular type of information: information "indicating whether the sender wants a corrected address to be provided for the addressee." Ex Parte Reexamination Certificate, '548 patent col. 2 ll. 4–6. If the sender wants updated address information, that information is transferred to the sender to enable it to update its mailing address files. *Id.* at col. 2 ll. 17–20. If not, information regarding the returned mail is nevertheless posted on a network so that the sender can access it. *Id.* at col. 2 ll. 21–24.

The parties treat claim 42 of the '548 patent as repre-

---

[18] The parties have not pointed to any evidence in the legislative history that compels us to reach a different statutory interpretation.

sentative for purposes of the § 101 inquiry:[19]

> 42.  A method for processing a plurality of undeliverable mail items, comprising:
>
> receiving from a sender a plurality of mail items, each including i) a written addressee, and ii) *encoded data indicating whether the sender wants a corrected address to be provided for the addressee*;
>
> identifying, as undeliverable mail items, mail items of the plurality of mail items that are returned subsequent to mailing as undeliverable;
>
> decoding the encoded data incorporated in at least one of the undeliverable mail items;
>
> creating output data that includes a customer number of the sender and at least a portion of the decoded data;
>
> determining the sender wants a corrected address provided for intended recipients based on the decoded data;
>
> *if the sender wants a corrected address provided, electronically transferring to the sender information for the identified intended recipients that enable the sender to update the sender's mailing address files; and*
>
> *if the sender does not want a corrected address provided, posting return mail data records on a network that is accessible to the sender to enable the sender to access the records.*

*Id.* at col. 2 ll. 1–24 (emphases added).

---

[19]  Return Mail does not advance any separate arguments with respect to dependent claims 43–44.

Section 101 of the Patent Act defines patent-eligible subject matter to include "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."   35 U.S.C. § 101. Under well-established case law, this provision implicitly excludes "laws of nature, natural phenomena, and abstract ideas" from the realm of patent-eligible subject matter. *Diamond v. Diehr*, 450 U.S. 175, 185 (1981). The Supreme Court has set forth a two-step framework for determining whether patent claims are drawn to a patent-ineligible concept. *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* 566 U.S. 66, 77–78 (2012)). First, one "determine[s] whether the claims at issue are directed to" a law of nature, natural phenomenon, or abstract idea. *Id.* If so, the second step is to "search for an inventive concept," namely "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (alteration in original) (internal quotation marks omitted).

1

Under *Alice* step 1, Return Mail contends that claims 42–44 may *involve* the abstract idea of "relaying mailing address data" but are not *directed* to such an abstract idea. Appellant's Opening Br. 48–50. The Supreme Court has cautioned that, "lest [the exclusionary principle] swallow all of patent law," an invention that simply "involves" an abstract idea is not patent ineligible under § 101. *Alice*, 134 S. Ct. at 2354. Return Mail focuses on two reasons why claims 42–44 merely involves an abstract idea:  first, the claims do not preempt other systems for relaying mailing address data; and second, they are directed to a specific improvement to technology for relaying mailing address data.

We agree with the Board that claims 42–44 are di-

rected to the abstract idea of "relaying mailing address data." J.A. 17. Claim 42 recites "receiving from a sender a plurality of mail items," "identifying undeliverable mail items," "decoding . . . encoded data," "creating output data," and "determining if the sender wants a corrected address." Ex Parte Reexamination Certificate, '548 patent col. 2 ll. 1–24. These steps are analogous to the steps of "collecting data," "recognizing certain data within the collected data set," and "storing that recognized data in memory," which we found to be abstract under Step 1 in *Content Extraction & Transmission LLC v. Wells Fargo Bank, National Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119 (2015). And "[t]he mere combination of data sources [similarly] . . . does not make the claims patent eligible." *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016).

Return Mail's contention that claims 42–44 are directed to a specific improvement in the area of returned-mail processing is unavailing. Appellant's Opening Br. 50. "[L]imit[ing] the abstract idea to a particular environment," here a mail processing system with generic computing technology, "does not make the claims any less abstract for the step 1 analysis." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016). The claims at issue are not analogous to claims "directed to a specific implementation of a solution to a problem in the software arts," which we have held not to be directed to an abstract idea. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016). Encoding and decoding mail recipient information—including whether the sender wants a corrected address—are processes that can, and have been, performed in the human mind. The claims here simply recite that existing business practice with the benefit of generic computing technology. That is insufficient to make the claims any less abstract under step 1.

2

We also reject Return Mail's argument that claims 42–44 are patent-eligible under *Alice* step 2 for reciting an inventive concept that transforms the abstract idea into "something more." *Alice*, 134 S. Ct. at 2354. The claims only recite routine, conventional activities such as identifying undeliverable mail items, decoding data on those mail items, and creating output data. We are also not persuaded by Return Mail's emphasis on the limitations reciting particular types of encoded data or particular uses of that data once decoded, such as sending the data or making it available to the sender, depending on the sender's preferences. These additional steps amount to a basic logic determination of what to do given a user's preferences. None of the recited steps, alone or together, suffice to transform the abstract idea into patent-eligible subject matter. They are akin to the routine, conventional steps of "updating an activity log, requiring a request from the consumer to view [an] ad, restrictions on public access, and use of the Internet," which we have held do not supply an inventive concept under step 2. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015).

Return Mail contends that claims 42–44 allow the sender to take other steps, "such as deleting obsolete address from a subsequent mailing," that do not appear in the claim language. Appellant's Opening Br. 15–16. In addition, Return Mail points to hardware, such "a mail sorter, optical scanner, databases, application servers, and the mail itself" to argue that claims 42–44 result in an "improvement to an existing technological process." *Id.* at 54–55. However, those limitations do not appear in the subject claims; instead, the claims focus only on encoding and decoding certain information and placing that information over a network. Ex Parte Reexamination Certificate, '548 patent col. 2 ll. 1–24. Thus, there is no basis in the claim language to import these steps and

components. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves."); *see also Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("[T]he important inquiry for a § 101 analysis is to look to the claim.").

Return Mail attempts to analogize the claims before us to claims that this court has held to be patent-eligible under step 2 in *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), and in *DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245 (Fed. Cir. 2014). We disagree. In those cases, the claimed inventions went beyond "merely the routine or conventional use of the Internet" or computer systems. *DDR*, 773 F.3d at 1259; *see also BASCOM*, 827 F.3d at 1351 (holding that a software-based invention that "improve[s] the performance of the computer system itself" recites patent-eligible subject matter (alteration in original)). Here, in contrast, claims 42–44 do not improve the functioning of the computer or barcode system itself. Instead, they apply those functionalities in the context of processing returned mail.

We conclude that claims 42–44 of the '548 patent lack an inventive concept that transforms an otherwise abstract idea into patent-eligible subject matter.

3

Finally, we address Return Mail's request for clarification on "the role that preemption plays" in the § 101 analysis. Appellant's Opening Br. 5. Return Mail proposes that we hold claims to be drawn to patent-eligible subject matter "if the practical effect of those claims would not preempt other commercially deployed and patentably distinct systems that involve the same abstract idea." *Id.* at 53. In other words, it asks us to adopt a test for determining whether claims are "directed to" an

abstract idea by looking to whether the claims have preempted others from entering the field.

Certainly, preemption is the underlying "concern that drives" the § 101 analysis. *Alice*, 134 S. Ct. at 2354. After all, monopolization of "the basic tools of scientific and technological work" would "thwart[] the primary object of the patent laws" to promote future innovation. *Id.* Preemption is therefore part and parcel with the § 101 inquiry. For example, we have often cited the lack of preemption concerns to support a determination that a claim is patent-eligible under § 101. *See, e.g.*, *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1315–16 (Fed. Cir. 2016); *BASCOM*, 827 F.3d at 1352 ("[T]he claims of the . . . patent do not preempt the use of the abstract idea of filtering content on the Internet or on generic computer components performing conventional activities.").

But we have consistently held that claims that are otherwise directed to patent-ineligible subject matter cannot be saved by arguing the absence of complete preemption. *See, e.g.*, *Synopsys*, 839 F.3d at 1150 (holding that an argument about the absence of complete preemption "misses the mark"); *FairWarning*, 839 F.3d at 1098 ("But even assuming that the . . . patent does not preempt the field, its lack of preemption does not save these claims."); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1320–31 (Fed. Cir. 2016) (same); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 701 (2015) ("[T]hat the claims do not preempt all price optimization or may be limited to [a particular] setting do not make them any less abstract."). As we have explained, "questions on preemption are inherent in and resolved by the § 101 analysis." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 2511 (2016). "While preemption may signal patent ineligible subject matter, the absence of complete

preemption does not demonstrate patent eligibility." *Id.* Arguments about the lack of preemption risk cannot save claims that are deemed to only be directed to patent-ineligible subject matter.

Relatedly, we reject Return Mail's implication that the Board reached inconsistent results by concluding that claims 42–44 are not patent-eligible under § 101 yet holding that the claims are not invalid as anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103. A "pragmatic analysis of § 101 is facilitated by considerations analogous to those of §§ 102 and 103." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015). And § 101 subject matter eligibility is a "threshold test" that typically precedes the novelty or obviousness inquiry. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010); *see also* Manual of Patent Examining Procedures § 2103 "Patent Examination Process" (9th ed., Nov. 2015) (listing steps of the patent examination process, with "[d]etermine whether the claimed invention complies with 35 U.S.C. 101" listed before "[d]etermine whether the claimed invention complies with 35 U.S.C. 102 and 103"). But § 101 subject-matter eligibility is a requirement separate from other patentability inquiries. *See Mayo*, 566 U.S. at 90 (recognizing that the § 101 inquiry and other patentability inquiries "might sometimes overlap," but that "shift[ing] the patent-eligibility inquiry entirely to these [other] sections risks creating significantly greater legal uncertainty, while assuming that those sections can do work that they are not equipped to do"); *Diehr*, 450 U.S. 175 at 190 ("The question . . . of whether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'").

At bottom, claims 42–44 of the '548 patent recite the use of barcode functionality and computer systems to provide updated address information, which is not sufficient to impart patent eligibility. *See OIP Techs.*, 788 at

1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible."), *cert. denied*, 136 S. Ct. 701 (2015).

## III.  CONCLUSION

For the foregoing reasons, we affirm the Board's decision.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

_____

**RETURN MAIL, INC.,**
*Appellant*

v.

**UNITED STATES POSTAL SERVICE,**
**UNITED STATES,**
*Appellees*

_____

2016-1502

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. CBM2014-00116.

_____

NEWMAN, *Circuit Judge*, dissenting.

An important threshold issue before the court is whether the United States and its agency the United States Postal Service are within the definition of "person" in § 18(a)(1)(B) of the America Invents Act, and thus entitled to proceed under that Act. The panel majority states that the appellant waived the issue because it was not raised in its opening brief. Maj. Op. at 24–25. However, matters of jurisdiction are not subject to disposition by waiver.

My colleagues hold that the question of whether the government is a "person" subject to the AIA was waived by the parties' failure to object. Although some issues

may be waived, statutory jurisdiction is not subject to waiver. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006) ("Moreover, courts, including this Court, have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–84 (1999) ("subject-matter delineations must be policed by the courts on their own initiative even at the highest level."); *United States v. Cotton*, 535 U.S. 625, 630 (2002) ("subject-matter jurisdiction . . . can never be forfeited or waived.").

My colleagues do not impart precision to their holding (or not) of waiver; rather, they "observe" that they would probably find waiver since the issue is not clearly within the "Article III context." Maj. Op. 25 n.15. However, considerations of subject matter jurisdiction are foundational to the tribunal's power. "It is well settled that no action of the parties can confer subject-matter jurisdiction on a tribunal and that the principles of estoppel do not apply to vest subject-matter jurisdiction where Congress has not done so." *Dunklebarger v. Merit Sys. Prot. Bd.*, 130 F.3d 1476, 1480 (Fed. Cir. 1997) (citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). The issue of whether the PTAB possesses the power to adjudicate a claim of invalidity involves subject matter jurisdiction, for the dispute must be within the limited scope granted by the Congress to the PTAB.

This court has an independent obligation to ascertain its own jurisdiction and that of the tribunal below. *See Mitchell v. Maurer*, 293 U.S. 237, 244 (1934) ("An appellate federal court must satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review."). Although the foregoing concerns a court's review of a lower court's jurisdiction, the same principle applies to review of an agency's jurisdiction. *See, e.g., Da Cruz v. INS*, 4 F.3d 721, 722 (9th Cir. 1993)

(considering, *sua sponte*, whether the BIA lacked jurisdiction). This inquiry cannot be waived. It is a "judicial function," and not that of an agency, to decide the limits of the agency's statutory powers. *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946).

"An agency is but a creature of statute. Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress." *Killip v. Office of Pers. Mgmt.*, 991 F.2d 1564, 1569 (Fed. Cir. 1993). *See also Sealed Air Corp. v. United States Int'l Trade Comm'n*, 645 F.2d 976, 993 (CCPA 1981) ("Any authority delegated or granted to an administrative agency is necessarily limited to the terms of the delegating statute."); *Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1117 (6th Cir. 1984) (administrative agencies are vested only with the authority given to them by Congress); *Atchison, Topeka & Santa Fe Ry. Co. v. Interstate Commerce Comm'n*, 607 F.2d 1199, 1203 (7th Cir. 1979) (same). "Though an agency may promulgate rules or regulations pursuant to authority granted by Congress, no such rule or regulation can confer on the agency any greater authority than that conferred under the governing statute." *Killip*, 991 F.2d at 1569 (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

The AIA states that a "person" can file a CBM petition in the PTO, and if the decision is adverse, that person is bound by the decision in any future litigation. The nature of the "person" is a factor in statutory jurisdiction. *See, e.g., Caterpillar Inc. v. Lewis*, 519 U.S. 61, 73, (1996) ("[T]here was in this case complete diversity, and therefore federal subject-matter jurisdiction, at the time of trial and judgment."); *United States v. Testan*, 424 U.S. 392, 397, 393 (1976) ("the measure of the Court of Claims' statutory jurisdiction" "presents a substantial issue concerning the jurisdiction of the Court of Claims and the relief available in that tribunal."). It is our obligation to

assure ourselves of the propriety of the PTAB's exercise of statutory authority.  Such obligation cannot be waived.

The general statutory definition is that a "person" does not include the United States and its agencies unless expressly provided.  It is at least as reasonable to assume that Congress, and those seeking the improvements provided by the America Invents Act, knew that "person" did not include the United States, lest additional complexities appear in the path of enactment of the America Invents Act.

The legislative record does not explore these potential complexities, but neither is there any suggestion that the standard rule of exclusion of the United States from the definition of "person" was simply legislative inadvertence, as my colleagues appear to believe.  The Congress cannot be deemed innocent of knowing that the government can indeed be sued for infringement, but only in the Court of Federal Claims; yet that court is conspicuously absent from the designation of tribunals subject to the America Invents Act.  *See, e.g.*, 35 U.S.C. §§ 315(e), 325(e), and AIA § 18(a)(1)(D) (stating provisions applicable to the PTO, the district courts, and the ITC).

The Covered Business Method statute states that "[a] **person** may not file a petition for [CBM review] unless the **person** or the **person**'s real party in interest or privy has been sued for infringement of the patent or has been charged with infringement under that patent." AIA § 18(a)(1)(B) (emphases added).  The Dictionary Act, 1 U.S.C. § 1, defines "person":

> In determining the meaning of any Act of Congress, unless the context indicates otherwise— . . . the word 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

The government is conspicuously absent from this definition, which pervades the legislative context, and from time to time receives judicial reinforcement. *See, e.g., United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947):

> In common usage the term ["person"] does not include the sovereign, and statutes employing it will ordinarily not be construed to do so. Congress made express provision, [] 1 U.S.C. § 1, for the term to extend to partnerships and corporations, and in § 13 of the Act itself for it to extend to associations. The absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them.

*Id.* at 275. *See also, e.g., Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) (statutes employing the usage "person" are ordinarily construed to exclude the government); *Lunday-Thagard Co. v. U.S. Dep't of Interior*, 773 F.2d 322, 324 (Temp. Emer. Ct. App. 1985) ("On several occasions it has been held that the government does not come within the definition of a 'person.'") (citing *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941) and *United Mine Workers of Am.*, 330 U.S. at 275).

Although exceptions may arise, such exceptions warrant considered analysis, not presumptive waiver by silence. In *United States v. Cooper Corp.*, the Court guided such analysis:

> [T]here is no hard and fast rule of exclusion. The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law.

*Id.* at 605.

The long-standing rule excluding the government from implicit inclusion as a statutory "person" applies to situations where the government would benefit from such inclusion, as well as situations where such inclusion would burden the government. For example, in *United States v. Fox*, the Court held that a devise of real estate to the Federal government was void because the New York Statute of Wills only permitted devises of land "to any person capable by law of holding real estate," and the federal government was neither a natural nor an artificial person. 94 U.S. 315, 321 (1876). The Court stated:

> The term 'person' as here used applies to natural persons, and also to artificial persons,—bodies politic, deriving their existence and powers from legislation,—but cannot be so extended as to include within its meaning the Federal government. It would require an express definition to that effect to give it a sense thus extended.

*Id.* As summarized in Corpus Juris:

> A statute regulating only persons and corporations does not include the government itself unless a contrary intention is clearly expressed. Thus, the word "person" used in a statute will not be construed so as to include the sovereign, whether the United States, or a state, or a government agency, or a city or town. However, the word may include the sovereign where the legislative intent to do so is manifest or where courts recognize the exception whereby government agencies are only excluded from the operation of general statutory provisions if their inclusion would result in an infringement upon sovereign governmental powers.

82 C.J.S. Statutes § 391 (citations omitted).

The CBM statute does not mention infringement litigation in the Court of Federal Claims, while reciting the analogous actions in the district courts and the International Trade Commission. My colleagues suggest that the legislative intent was to silently give the United States the benefit of the AIA, but not the burden of the estoppel provision. The estoppel provision, however, is the *quid pro quo* that underlay enactment of the AIA.

The estoppel provision is the backbone of the AIA, for it is through estoppel that the AIA achieves its purpose of expeditious and economical resolution of patent disputes without resort to the courts. The government so emphasized, throughout the gestation of the AIA. Then-Director of the PTO Dudas told the Congress:

> [T]he estoppel needs to be quite strong . . . any issue that you raised or could have raised . . . you can bring up no place else. That second window, from the administration's position is intended to allow nothing–a complete alternative to litigation.

*Patent Reform: The Future of American Innovation: Hearing Before the Senate Comm. on the Judiciary*, 110th Cong. 13 (2007) (statement of Director Jon Dudas). When the final version of the legislation was enacted, successor-Director Kappos reiterated the importance of the estoppel provision:

> If I can say that in my own words also, that I believe there are significant advantages for patentees who successfully go through the post-grant system—in this case inter partes review—because of those estoppel provisions. Those estoppel provisions mean that your patent is largely unchallengeable by the same party.

*America Invents Act: Hearing on H.R. 1249 Before the House Comm. on the Judiciary*, 112th Cong. 52–53 (2011) (statement of Director David Kappos).

My colleagues would grant the United States the benefit of post-grant challenge in the PTO, but would omit the statute's estoppel against raising the same challenge in court. This statutory balance, of administrative challenge in exchange for finality, is the foundation of the America Invents Act. It may be that recognition of the complexity of binding the government to estoppel led to the omission of the government. We can only speculate as to the reason, but it is clear that the government is not included as a "person" subject to the AIA.[1]

---

[1] The panel majority states that in this dissent I "engage[] in mere speculation that Congress intended to exclude the government from filing petitions despite the lack of a record or any indication that it intended this result." Maj. Op. 27. I do not speculate as to the meaning of "person"; its meaning has been defined by Congress for legislative use. Nor do I speculate as to the decade of legislative history of the America Invents Act. As Justice Frankfurter wrote, statutory interpretation "demands awareness of certain presuppositions." *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947). The majority ignores the extensive backdrop of law and history on which the AIA was enacted.

In doing so, the majority construes the statutory provision in isolation, declining to consider the purpose and intent of the legislature in exclusion of the Government from the estoppel provisions. *See Richards v. United States*, 369 U.S. 1, 11 (1962) (It is "fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, we must not be guided by a single sentence or member of a sentence, but should look to the provisions of the whole law, and to its object and policy.") (quotations and citations omitted).

The panel majority argues that erring on the side of prudence is "letting the tail wag the dog." Maj. Op. 27. The majority assumes that Congress gave no particular thought to whether the government should be subject to the estoppel provision. However, the dominant purpose of finality and economy of litigation is based on the estoppel provision and informs any analysis of the statutory plan. *See United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole.").

The panel majority errs in stating that the proper inference is that the government is a "person" under this statute, for the vast weight of statute and precedent requires the opposite inference. One might wonder why the drafters of the America Invents Act did not assure inclusion of the United States in post-grant proceedings, for the government is a participant in the patent system, and a sufficiently frequent plaintiff or defendant to be recognized.

Can my colleagues be correct in concluding that, over the lengthy and vigorous gestation of the AIA, it did not occur to anyone to consider the participation of the government? If inclusion of the United States and its agencies was indeed intended, as the majority holds, is this silence merely a matter of legislative error, subject to repair by the judiciary?

The theory that the United States was accidentally omitted as a "person" subject to the AIA is contrary to the vast body of precedent. When the government is excluded

---

The only "rewriting of the plain language of a statute," Maj. Op. 27, comes from the pen of the majority, who ignores the presumption of exclusion of the government from the scope of "person."

on the face of a statute, the presumption that the legislature intended to exclude the government may only be overcome by strong evidence of intent to include. Such evidence is conspicuously lacking here.

Indeed, inclusion of the government as a "person", assumed by the majority, requires the assumption that legislators intended to grant the government access to post-grant proceedings in the PTAB while also intending to remove the government from the estoppel provision, thereby giving the government "two bites at the apple," in the majority's words. Such an irregular assumption, with no hint of support in the statute or legislative history, cannot be countenanced. "The words of the statute should be read in context, the statute's place in 'the overall statutory scheme' should be considered, and the problem Congress sought to solve should be taken into account." *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 796 (D.C. Cir. 2004) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

Even if waiver of a jurisdictional defect were available, the court is responsible to assure that waiver comports with the statutory purpose. *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1251 (Fed. Cir. 2005) (we "retain[ ] case-by-case discretion over whether to apply waiver"). In addition, "[u]nder certain circumstances, we may consider issues not previously raised . . . ." *Automated Merch. Sys., Inc. v. Lee*, 782 F.3d 1376, 1379 (Fed. Cir. 2015). Such circumstances include whether "the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice" and whether "the issue presents significant questions of general impact or of great public concern" or "the interest of substantial justice is at stake." *Id.* (citations omitted). This question requires resolution.

The statutory record contains no foundation for this court's departure from the explicit text of the legislation.

The government is not a "person" to whom the post-grant procedures of the AIA are available.  Thus I would vacate the decision of the Board, for the proceeding is beyond the Board's statutory authority.  *See* 2 Richard J. Pierce Jr., Administrative Law Treatise § 14.2, at 1185 (5th ed. 2010) ("An agency has the power to resolve a dispute or an issue only if Congress has conferred on the agency statutory jurisdiction to do so."); 5 U.S.C. § 706(2)(c).